Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | W. Thomas Rosemond, Jr. |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7249 | **DATE** | 6/1/00 |
| **CASE TITLE** | CSC Holdings, Inc. v. Greenleaf Electronics, Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]
Per the attached <u>Report and Recommendation</u>, Plaintiff's <u>Motion For Preliminary Injunction</u> is granted. The <u>Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction</u> is granted. <u>Christine Alonso's Motion To Partially Dissolve Preliminary Injunction</u> is denied. Referral terminated. Case returned to District Judge.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | number of notices | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | | |
| x | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | | |
| x | Copy to judge. | | | | |

JUN 0 2 2000

LG/lc

courtroom deputy's initials

Date/time received in central Clerk's Office

date docketed

docketing deputy initials

date mailed notice

mailing deputy initials

23

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CSC HOLDINGS, INC.,                              )
                                                 )
                 Plaintiff,                      )
                                                 )        Case No. 99 C 7249
        v.                                       )
                                                 )        Judge Holderman
GREENLEAF ELECTRONICS, INC., CHRISTINE           )
ALONSO, KATHY "DOE", JOHN DOES 1-10,             )
JANE DOES 1-10, UNIDENTIFIED                     )
CORPORATIONS 1-10, AND UNIDENTIFIED              )
BUSINESS ENTITIES 1-10,                          )
                                                 )
                 Defendants.                     )

### Report & Recommendation

Before the Court are Plaintiff's Motion For Preliminary Injunction; Defendant Christine Alonso's Motion To Partially Dissolve Preliminary Injunction; and the Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction. Plaintiff's Motion For Preliminary Injunction is granted. The Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction is granted. Christine Alonso's Motion To Partially Dissolve Preliminary Injunction is denied.

### Background.

On November 8, 1999 Plaintiff brought an ex parte Motion For Temporary Restraining Order, For Preliminary Injunction, For

-1-

Asset Freeze And Accounting, And To Expedite Discovery. On

November 8, 1999, the District Judge granted an ex parte

Temporary Restraining Order which provided for a freeze of

Defendants' assets, an accounting, and expedited discovery.[1]

Pursuant to the Order, Plaintiff posted a $15,000 bond with the

Clerk of the Court. The Motion For Preliminary Injunction was

referred to the Magistrate Judge. Christine Alonso's Motion To

Partially Dissolve Preliminary Injunction and the Motion By

Timothy L. Alonso & Anthony Serra To Intervene In The Motion To

Partially Dissolve The Preliminary Injunction are also included

within the scope of the referral. The Magistrate Judge held a

preliminary injunction hearing on December 9, 1999.

## FINDINGS OF FACT.

1. Plaintiff is a cable television service provider that

operates and maintains cable television systems pursuant to

franchises awarded to it, which authorize it to construct,

operate, and maintain cable television systems in communities

located in parts of New York, New Jersey, Connecticut,

Massachusetts, Ohio, and Michigan. Plaintiff offers cable

television programming to subscribers who request and pay for the

---

[1]District Judge's November 8, 1999 Order (docket entry #10).

programming.[2]

2. Plaintiff's programming is offered to its subscribers in "packages" of programming services. "Basic" and "Family" are packages of programming services that a subscriber selects at a monthly rate. Subscribers may also elect to purchase one or more "premium" programming services, such as Cinemax, Home Box Office, and Showtime for an additional monthly charge per service.[3]

3. Plaintiff also offers pay-per-view programming, a service enabling subscribers to purchase individual movies, sporting events, or other entertainment for a per event fee over and above the subscriber's regular monthly subscription fee.[4]

4. Each subscriber is entitled to receive only that level of programming and services that he or she selects and purchases.[5]

5. The signals for all of Plaintiff's cable television services, many of which originate as over-the-air satellite signals, are transmitted from Plaintiff's reception facilities to subscribers' homes through a network of cable wiring and

---

[2] Aff. of Donald Kempton, ¶ 3 (Oct. 29, 1999).

[3] Id. at ¶ 4.

[4] Id., at ¶ 5.

[5] Id., at ¶ 6.

equipment (the "System"). In order for a subscriber to receive these transmitted "non-broadcast" cable television signals on his or her television set, Plaintiff provides each subscriber with a device known as a "converter", which converts the signals of multiple services simultaneously transmitted over the System into different "channels" which can be viewed clearly on a subscriber's television set.[6]

6.  Plaintiff's signals are private telecommunications not intended for public use.[7]

7.  To prevent subscribers from receiving programming services for which they have not paid, Plaintiff encodes or "scrambles" the signals for specific programming services. Subscribers purchasing scrambled programming services are provided with a device known as a "decoder", which is incorporated into a converter. Together, they are called a "converter-decoder". This device decodes the scrambled signals so that the programming selected and purchased can be viewed clearly on a subscriber's television set. Programming services not purchased, therefore, will continue to be scrambled and will

---

[6] Id., at ¶ 7-8.

[7] Id., at ¶ 14.

be unviewable on the subscriber's television set.[8]

8.   Encoding or "scrambling" is a primary security method employed by Plaintiff (and most cable systems) to prevent subscribers from receiving programming services for which they have not paid.[9]

9.   The authorized converter-decoders provided by Plaintiff to its subscribers each have the function and feature known as "addressability".  An addressable converter-decoder is one which, when attached to the System, can communicate with Plaintiff's central computer.  The feature and function of addressability is essential to the billing of pay-per-view programs.  The reception of a pay-per-view program is authorized when a command is sent from the central computer of the System to the converter-decoder of the purchasing subscriber.  This command instructs the converter-decoder to decode the otherwise unscrambled picture of the pay-per-view program to be shown.  A charge for the purchased pay-per-view program is documented and generated by the System's central computer only when the corresponding purchase order and authorization command for the viewing of a pay-per-view program

---

[8]*Id.*, at ¶ 8.

[9]*Id.*, at ¶ 9.

is received and acted upon through the addressability function and feature of the subscriber's converter-decoder.[10]

10. It is possible for a dishonest individual to install an unauthorized or "pirate" cable television decoding device (one programmed to descramble all programming services) onto Plaintiff's cable system in order to receive all of Plaintiff's scrambled programming, without authorization and without making payment therefor. In most cases, Plaintiff cannot detect or prevent the theft of its programming services from such devices without affirmative permission from a subscriber to conduct an on-site inspection.[11]

11. Defendant Greenleaf is an Illinois corporation, organized on May 7, 1991. Greenleaf's place of business is at 801 Eagle Drive, Bensenville, Illinois.[12]

12. Defendant Christine Alonso is Greenleaf's President and Secretary.[13]

13. Defendant Alonso was on Greenleaf's payroll as early as

---

[10]Id., at ¶ 10.

[11]Id., at ¶ 11.

[12]Aff. of Joseph Flaim, ¶ 4 (Oct. 29, 1999); see also Plaintiff's Ex. 1.

[13]Id.; see also R. at 28.

-6-

1991.[14]

14.  Defendant Alonso signed checks on behalf of Greenleaf.[15]

15.  Defendants Greenleaf and Alonso have engaged in the business of selling for profit unauthorized or "pirate" cable television decoding devices for use on Cablevision's cable systems.[16]

16.  The decoding devices sold by Defendants are not practicably detectable by Plaintiff, meaning that they are capable of defeating or circumventing Plaintiff's software-driven electronic security measures that have as their sole purpose the disabling of "pirate" decoding devices.[17]

17.  Defendants advertised and marketed their products to Plaintiff's cable television subscribers _via_ publications with national distribution and, in the process of selling their decoding devices, indicated that the devices were for use on Plaintiff's cable television system.[18]

---

[14]Plaintiff's Ex. 4.

[15]Plaintiff's Ex. 5.

[16]_Id._ at ¶¶ 5-17.

[17]_Id._ at ¶¶ 14, 17.

[18]_Id._ at ¶¶ 2, 5, & 15.

18. In or around March, 1999, Plaintiff commenced its investigation of Greenleaf based on Greenleaf's advertisements in publications with national circulation such as <u>Nuts & Volts</u> magazine.[19]

19. On March 4, 1999, Flaim called the telephone number listed in Greenleaf's advertisement and purchased a "Storm Plus" descrambling device. During the call, Flaim spoke to someone who identified herself as "Chris".[20]

20. On March 10, 1999, Flaim received a Federal Express package from "Chris" at Greenleaf Electronics, 801 Eagle Drive, Bensenville, Illinois, in which he found the decoding device he ordered on March 4, 1999.[21]

21. On March 10, 1999, Flaim tested the device and found it to be inoperable.[22]

22. After attempting with the assistance of a Greenleaf representative to get the device to function, Flaim returned the device to Greenleaf for an exchange. He received a replacement

---

[19]Aff. of Donald Kempton, ¶ 15; Aff. of Joseph Flaim, ¶ 2.

[20]Aff. of Joseph Flaim, ¶ 5.

[21]Aff. of Joseph Flaim, ¶ 6; <u>see also</u> Plaintiff's Ex. 2.

[22]Aff. of Joseph Flaim, ¶ 7.

device on April 14, 1999.[23]

23. On April 15, 1999, Flaim tested the device and found it to be capable of permitting a television set attached to Plaintiff's Nassau County, New York system to receive all of Plaintiff's scrambled premium and pay-per-view services without authorization.[24]

24. On April 21, 1999, Flaim again called Greenleaf and ordered a descrambling device for use on Plaintiff's Long Island, New York cable system.[25]

25. On April 23, 1999, Flaim received a Federal Express package from "Chris" at Greenleaf Electronics, Inc., 801 Eagle Drive, Bensenville, Illinois, which contained the device he ordered on April 21, 1999.[26]

26. On April 23, 1999, Flaim tested the device and found it to be capable of permitting a television set attached to Plaintiff's Nassau County, New York system to receive all of Plaintiff's scrambled premium and pay-per-view services without

---

[23]Aff. of Joseph Flaim, ¶¶ 8-13; see also Plaintiff's Ex. 2.

[24]Aff. of Joseph Flaim, ¶ 14.

[25]Id. at ¶ 15.

[26]Aff. of Joseph Flaim, ¶ 16; Plaintiff's Ex. 3.

authorization.[27]

27.  On March 16, 1999, an Illinois private investigator retained by Cablevision conducted initial surveillance at Greenleaf's address.  The structure at this address is a one story brick building, approximately 40' x 120' with a loading dock and garage bay door.  It is located within an industrial park.  The private investigator observed five vehicles outside the location, including one which was leased by a "Timothy Alonso".[28]

28.  On March 18, 1999, Flaim conducted additional surveillance at the Defendants' business location.  On that day, he again observed the vehicle leased by Timothy Alonso parked outside the building.  While conducting the surveillance, Flaim also inspected Defendants' trash, which had been left outside for pickup.  One item he recovered was a United Parcel Service Tracking Summary, used to determine whether a UPS package had been delivered.  This document, a copy of which was attached to his affidavit as Exhibit H, showed that a package delivered to

_____

[27]Aff. of Joseph Flaim, ¶ 17.

[28]Id. at ¶ 18.

-10-

Greenleaf was received on March 12, 1999 by "Alonso".[29]

29.  On May 5, 1999, Flaim returned to Greenleaf's business location to conduct additional surveillance.  He observed a Federal Express truck driver enter the building and then return to his truck several minutes later carrying a shipping box that was similar in size and shape to those Flaim had received from Greenleaf when he ordered decoding devices.  Flaim also observed that the vehicle leased by "Timothy Alonso" was among the vehicles parked outside the business location.[30]

30.  On November 8, 1999, Plaintiff sought an ex parte temporary restraining order.  A temporary restraining order ("TRO") was entered by the Court.  The TRO enjoined Defendants' further sales of cable television decoding devices; provided for a freeze of Defendants' business and personal assets; and allowed expedited discovery.  The Court's review of Plaintiff's application indicated that Plaintiff had made out a prima facie case for the award of such relief and that the need for each aspect of the relief sought therein was clear.  Defendants were subsequently served with copies of the Summons and Complaint,

---

[29] Id. at ¶¶ 19-20.

[30] Id. at ¶ 21.

along with the TRO and Plaintiff's application therefor.

31.  After the TRO was entered, Plaintiff learned that Comcast Cablevision ("Comcast"), a cable television operator similar to Plaintiff had been involved in the execution of a search warrant and seizure in 1997 in Las Vegas, Nevada, against a distributor of "pirate" cable television decoding devices known as Teleview Distributors ("Teleview").  Present at the seizure were individuals named Santo LaMantia and Bruce Quacquarini.[31]

32.  As a result, Plaintiff procured an affidavit from William Bowyer, who is employed by Comcast and was present at the search warrant execution and seizure, describing these events.[32]

33.  Among the items seized at the search warrant execution and seizure at Teleview were business records, including approximately 8,600 decoding device sales invoices of Defendant Greenleaf Electronics, located at 801 Eagle Drive, Bensenville, Illinois.  These invoices cover the time period of December 16, 1996 to September 10, 1997.[33]

---

[31]Supp. Aff. of Joseph Flaim, ¶ 2 (Dec. 8, 1999); Aff. of William Bowyer, ¶¶ 2-4 (Nov. 15, 1999).

[32]Aff. of Joseph Flaim, ¶ 2.

[33]Supp. Aff. of Joseph Flaim, ¶ 3; see also Ex. A to Supp. Aff. of Joseph Flaim; Plaintiff's Ex. 4, 5, & 6.

34.  An examination of Plaintiff's exhibits 4, 5, and 6 reveals that in addition to Christine Alonso, the following individuals are among those who were either on the payroll of Greenleaf, or signed checks on behalf of Greenleaf: Bruce Quacquarini, Tom LaMantia, Santo LaMantia, James Marx, Violet LaMantia, Pamela LaMantia, and Joann LaMantia.[34]

35.  Plaintiff requested from Comcast the Greenleaf invoices and other records.  Comcast sent them to Plaintiff.[35]

36.  Flaim analyzed the Greenleaf invoices in order to identify the ones that reflect sales to customers who reside in Plaintiff's franchise areas, and to determine whether those invoices reflect sales of "pirate" cable decoding devices.[36]

37.  Of the invoices Flaim analyzed, 183 of them are Greenleaf invoices to customers who reside in Plaintiff's franchise areas.  Those 183 invoices reflect Greenleaf's sales of 224 "pirate" cable television decoding devices.[37]

38.  The TRO was extended on consent of the parties and a hearing was held on December 9, 1999, at which the parties had

---

[34] Plaintiff's Ex. 4, 5, & 6.

[35] Supp. Aff. of Joseph Flaim, ¶ 4.

[36] Id. at ¶ 5.

[37] Id. at ¶ 7.

the opportunity to offer testimony and evidence and make legal arguments.

39.  Due to Defendants' sales of "pirate" decoders, Plaintiff has suffered and will continue a suffer a loss of sales and a loss of goodwill.  More specifically, Plaintiff's goodwill loss can be described as damage to the value of its franchise(s) and to the value of Plaintiff's existing customers due to the fact that many of Plaintiff's existing customers can utilize Defendants' "pirate" decoders in order to receive Plaintiff's premium programming without paying for it.

40.  The harm done by Defendants' sales of decoders is ongoing and is difficult to stop or ascertain since Plaintiff's ability to detect the use of such devices is limited at best.

41.  There is a substantial likelihood that Defendant will continue its operations absent an injunction.

42.  Greenleaf is a carefully planned, fraudulent enterprise that has been in operation for several years.

43.  There are significant ties between Greenleaf and Teleview.  The ties suggest that Defendants' enterprise is large in scope and that Defendants' may easily be able to continue business by moving its business location.

44.  Defendants knew or intended that the "pirate" decoders

-14-

would be used to fraudulently obtain cable services.

## CONCLUSIONS OF LAW

1.    Any finding of fact which may be deemed a conclusion of law shall be deemed a conclusion of law.  Any conclusion of law which may be deemed a finding of fact shall be deemed a finding of fact.

2.    This action arises under 47 U.S.C. § 553, et seq., 17 U.S.C. § 1201, et seq., and 720 ILCS 5/16-10, et seq.  The Court has jurisdiction over this action under 28 U.S.C. § 1331 and has supplemental jurisdiction over the Illinois statute and common law constructive trust claims asserted in the complaint.  Venue is properly established in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 (b).

### I. Plaintiff's Causes of Action

3.    **47 U.S.C. § 553, et seq**: Plaintiff has proprietary rights in the cable programming services offered over its cable systems.  It is a "person aggrieved" by violations of the Communications Act and is thereby authorized to institute this action under 47 U.S.C. § 553 (c)(1).  47 U.S.C. § 553(a)(1) provides:

> No person shall intercept or receive or assist in
> intercepting or receiving any communications service
> offered over a cable system, unless specifically

-15-

authorized to do so by a cable operator or as may
otherwise be specifically authorized by law.

Subsection 553(a)(2) defines the prohibition against "assisting"
in this activity to include the manufacture or distribution of
illegal or "pirate" descrambling devices.  "Assisting in
intercepting or receiving" includes the manufacture or
distribution of equipment intended by the manufacturer or
distributor of equipment (as the case may be) for unauthorized
reception of any communications service offered over a cable
system in violation of subparagraph (1).[38]  Legislative history
confirms that subsection 553(a)(2) was "primarily aimed at
preventing the manufacture and distribution of so-called 'black
boxes' and other unauthorized converters which permit reception
of cable service without paying for the service."[39]

The manufacture or sale of modified converter-decoders with
specific knowledge or intent that the device will be used for
unauthorized interception and decryption of cable television
programming is a violation of 47 U.S.C. § 553(a)(1).[40]

---

[38]47 U.S.C. § 553(a)(2).

[39]H.R. Rep. No. 934, 98th Cong., 2d Sess. 84 (1984),
reprinted in U.S. Code Cong. & Admin. News 4655, 4721.

[40]United States v. Norris, 88 F.3d 462, 466 (7th Cir. 1996);
United States v. Gardner, 860 F.2d 1391, 1394 (7th Cir. 1988).

-16-

4.   **17 U.S.C. § 1201, et seq**: Plaintiff has proprietary rights in technological measures it uses to effectively control access to works protected under the Copyright Act.   17 U.S.C. § 1201 prohibits the circumvention of technological measures that control access to a copyrighted work.   Plaintiff is a person injured by a violation of 17 U.S.C. § 1201 (a)(2) and is thereby authorized to bring this action under 17 U.S.C. § 1203 (a).[41]

5.   **720 ILCS 5/16-10, et seq.**: 720 ILCS 5/16-10(a)(3) prohibits the assistance or instruction of another person to obtain cable.   Intent to defraud must also be present.   720 ILCS 5/16-12 prohibits knowingly selling or distributing cable decoders with intent to aid a person seeking unauthorized reception of cable services.

## II. Preliminary Injunctive Relief

6.   **Plaintiff is entitled to an equitable injunction**.   A plaintiff seeking a preliminary injunction has the burden of establishing: **(1)** the plaintiff's likelihood of prevailing on the

---

[41]17 U.S.C. § 1201 (a)(2) provides that "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]".

merits of his claim; **(2)** that the plaintiff would suffer
irreparable harm absent an injunction because the remedy at law
would be inadequate; **(3)** that the harm to the defendant if the
injunction were granted is less than the harm to the plaintiff if
it were not; and **(4)** that the injunction is in the public
interest.[42]  Affidavits and other evidence not admissible at
trial may be considered at the preliminary injunction stage.[43]
The Court finds that Plaintiff has made the necessary showing
with respect to each of these factors.

a.  **Plaintiff has clearly demonstrated a likelihood of
success on the merits of its claims**, both with respect to
controlling case law and the undisputed facts regarding
Defendants' "pirate" decoding device sales operation.  First of
all, Plaintiff has demonstrated that Defendants are likely in
violation of 47 U.S.C. § 553 which prohibits assisting in the
unauthorized reception or interception of cable television
programming.  Additionally, Plaintiff has demonstrated that

---

[42]MacDonald v. Chicago Park Dist., 132 F.3d 355, 357 (7th
Cir. 1997); Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,
128 F.3d 1111, 1114 (7th Cir. 1997); Erickson v. Trinity Theatre,
Inc., 13 F.3d 1061, 1067 (7th Cir. 1994).

[43]Illinois ex rel Hartigan v. Peters, 871 F.2d 1336, 1342
(7th Cir. 1989).

Defendants are likely in violation of 17 U.S.C. § 1201 which
prohibits the circumvention of technological measures which are
designed to control access to a copyrighted work.  Finally,
Plaintiff has demonstrated that Defendants are likely in
violation of 720 ILCS 5/16-10 and 5/16-12, which prohibit the
fraudulent assistance of another in obtaining cable and prohibit
knowing sale or distribution of "pirate" decoders with intent to
aid in unauthorized reception.

b.    **Plaintiff has shown irreparable injury.**  With respect
to irreparable injury, Plaintiff has presented evidence
describing the loss of revenue and subscribers resulting from the
distribution of decoding devices, and the practical inability of
Plaintiff to detect the presence of and eliminate the loss of
revenue resulting from "pirate" decoder boxes.

Additionally, a loss of goodwill[44] or the loss of sales and
the opportunity to maintain and develop relationships with
existing customers can constitute irreparable injury.[45]

_____

[44]Meridian Mut. Ins. v. Meridian Ins. Group, Inc., 128 F.3d
1111, 1121 (7th Cir. 1997); Gateway E. Ry. Co. v. Terminal R.R.
Ass'n of St. Louis, 35 F.3d 1134, 1139-40 (7th Cir. 1994); see
also Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 16 (7th Cir.
1992).

[45]Duct-O-Wire Co. v. U.S. Crane, Inc., 31 F.3d 506, 509-10
(7th Cir. 1994).

Plaintiff has suffered a loss of goodwill and of its ability to maintain sales to certain existing customers. Additionally, without the temporary remedy of an injunction, there is no guarantee that Defendants will not continue to engage in violations of 47 U.S.C. § 553 and 17 U.S.C. § 1201, causing further irreparable harm.

      c. **Plaintiff has no adequate remedy at law.** Any adequate remedy for Plaintiff would necessarily have to include equitable relief that would prevent Defendants from selling additional "pirate" decoder boxes in the future.

      d. **A balancing of the parties' respective hardships reveals** that the injunction means only that Defendants will be enjoined from conducting a business that is prohibited by federal law. Such illegal activities are not worthy of any protection.[46] The mere illegality of the production of "pirate" decoders was insufficient to prevent Defendants from successfully selling such decoders for years. The continued sale of such decoders constitutes continuing, largely unquantifiable, irreparable harm upon Plaintiff's business integrity and revenues. Therefore, the balance of hardships in this case leans strongly towards

---

[46]ON/TV of Chicago v. Julien, 763 F.2d 839, 844 (7th Cir. 1985).

Plaintiff's request for a preliminary injunction.

Defendants' illegal modification or distribution of cable television decoding devices acts against the public interest. Conversely, stopping such behavior promotes the public interest by preventing conduct Congress declared illegal in 47 U.S.C. § 553. An injunction would be in the public interest since it would promote the enforcement of federal and state law; reduce costs to law-abiding cable subscribers by reducing their subsidization of cable service theft[47]; and would support the protection of intellectual property rights.

7. **Plaintiff also meets the requirements for a statutory injunction.** Although we are granting the injunction on equitable grounds, we note that Plaintiff would also meet the requirements for a statutory injunction under either federal or state statutes. If we had not concluded that Plaintiff met the requirements for an equitable injunction, we still would have granted an injunction based on the statutes.

8. **An injunction could be granted on federal statutory grounds.** In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show

---

[47]See H.R. Rep. No. 934, 98th Cong., 2d Sess. 84 (1984), reprinted in U.S. Code Cong. & Admin. News 4655, 4720.

that there is a reasonable likelihood of future violations in order to obtain relief.[48] The federal statutes under which Plaintiff brings its claim explicitly allow the Court to grant a preliminary injunction to the extent reasonable to prevent or restrain a violation.[49] The evidence suggests that there is a reasonable likelihood of future violations, to-wit: continued sales of "pirate" decoders. If we were not granting the preliminary injunction on equitable grounds, we would do so on federal statutory grounds.

   9.   **An injunction could be granted as provided for in the Illinois statutes.** We are granting the preliminary injunction on equitable grounds, but if we were not doing so, we would grant a preliminary injunction as provided for in the Illinois statute, 720 ILCS 5/16-13(c). 720 ILCS 5/16-13 provides for an injunction for any violation of 720 ILCS 5/16-10, 5/16-11, or 5/16-12. Plaintiff has demonstrated a likelihood of success under both 5/16-10 and 5/16-12. Consequently, 720 ILCS 5/16-13 would allow for an injunction **without** special damages, irreparable harm, or inadequate legal remedies.

---

[48]SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982); CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979).

[49]See 12 U.S.C. § 1203 (b)(1); 47 U.S.C. § 553 (C)(2)(A).

10.  **Continuing the asset freeze is appropriate**.  A court has no authority to issue a preliminary injunction preventing a party from disposing its assets pending adjudication of a claim **for money damages**.[50]  However, a court still has the equitable power to freeze a party's assets where injunctive relief is sought.[51]  The power to freeze assets includes cases where a combination of monetary and equitable relief is sought.[52] Plaintiff's Amended Complaint includes claims for both monetary damages and equitable relief.  Plaintiff seeks equitable relief which includes an injunction to prevent Defendants' sale or distribution of "pirate" decoders; impoundment and destruction of existing illegal decoders; and a constructive trust on the illicit revenue from the sales of such decoders.[53]  Plaintiff seeks monetary relief which includes actual or statutory damages and punitive damages.[54]

---

[50]Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 333 (1999).

[51]Deckert v. Independence Shares Corp., 311 U.S. 282, 289-90 (1940); United States ex rel Rahman v. Oncology Assoc., P.C., 198 F.3d 489, 496-97 (4th Cir. 1999).

[52]Rahman, 198 F.3d at 498 (citing Deckert, 311 U.S. at 289-90).

[53]Plaintiff's Amended Complaint, at 15-17.

[54]Id.

Continuing the asset freeze is appropriate because it would
preserve the availability of a constructive trust as a remedy;
make it easier to impound and destroy existing illegal decoders;
and facilitate further equitable relief preventing future sales
of "pirate" decoders by making it more difficult for Defendants
to simply pick up and move their enterprise to a new location.

## III. Christine Alonso's Motion To Partially Dissolve The Preliminary Injunction is denied.

11.   We are granting leave to intervene in the motion to
partially dissolve the preliminary injunction to non-parties
Timothy L. Alonso and Anthony Serra.  It appears that Timothy L.
Alonso and Anthony Serra hold joint accounts (with Christine
Alonso) which have been affected by the asset freeze portion of
the TRO.  Therefore, they should be allowed to intervene in the
motion.

12.   **Christine Alonso's Motion To Partially Dissolve The
Preliminary Injunction is denied.**  As detailed throughout the
body of this Order, the facts and applicable case law support the
issuance of a preliminary injunction and a continued asset
freeze.  Christine Alonso's affidavit and the extremely limited
showing by Ms. Alonso at the preliminary injunction hearing do
not suggest otherwise.

-24-

Additionally, the interveners present no persuasive arguments. The only case cited by the interveners, <u>United States v. Gotti</u>, is completely inapplicable to the current case because it specifically addresses whether a post-indictment, pre-trial restraint of substitute assets is allowed **under the RICO statutes**.[55] Timothy L. Alonso and Anthony Serra have not cited any case law to support their assertions that the bank accounts that they jointly hold with Defendant Christine Alonso should not be subject to an asset freeze.

**<u>Accordingly, it is adjudged and recommended as follows:</u>**

1.    Plaintiff's <u>Motion For Preliminary Injunction</u> is granted.

2.    <u>Motion By Timothy L. Alonso & Anthony Serra To Intervene In The Motion To Partially Dissolve Preliminary Injunction</u> is granted.

3.    <u>Christine Alonso's Motion To Partially Dissolve Preliminary Injunction</u> is denied.

4.    The relief ordered by the District Judge in the November 8, 1999 <u>Temporary Restraining Order</u> is hereby continued until the entry of judgment or dismissal.

---

[55]155 F.3d 144, 147 (2d. Cir. 1998).

5.    Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties must file their objections to the **Report and Recommendation** with The Honorable James F. Holderman within 10 days after being served with a copy of the Report.  Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Report.[56]

**So Recommended.**

Dated: June 1, 2000

W. Thomas Rosemond, Jr.
United States Magistrate Judge

---

[56] Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538 (7th Cir. 1986).  See also, The Provident Bank v. Manor Steel Corp., 882 F.2d 258, 261 (7th Cir. 1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or §636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Report).